UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

GUADALUPE GALLEGO OCHOA, an alien,
and GUADALUPE ARANZAZU GAYOSSO
GALLEGO, an alien,

               Plaintiffs,                              **JURY TRIAL DEMANDED**

vs.

EMPRESAS ICA, S.A.B. de C.V., an alien
corporation; and PEDRO TOPETE VARGA,
an alien,

               Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiffs, GUADALUPE GALLEGO OCHOA ("Gallego") and GUADALUPE ARANZAZU GAYOSSO GALLEGO ("Gayosso") (collectively, "Plaintiffs"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 4, sue Defendants EMPRESAS ICA, S.A.B. de C.V. ("ICA") and PEDRO TOPETE VARGA ("Topete") and allege:

### PARTIES, JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, based upon 18 U.S.C. § 1962.

2.     Gallego is a Mexican national residing in this district.

3.     Gayosso is a Mexican national residing in this district.

4.     ICA is a Mexican company doing business within this district, this state and/or the United States of America.

5.      Topete is a Mexican national doing business within this district, this state and/or the United States of America. On information and belief, Topete also owns and/or controls real property, bank accounts and other personal property within this district.

6.      Venue is proper in this district because the scheme of organized fraud set forth herein was formulated and executed and/or had its important effects in this district, the Plaintiff victims are resident here, and many of the funds transfers which enabled Defendants' scheme to operate either originated or passed through this district. 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**a.      Initial Relationships**

7.      Gallego is Gayosso's mother. Gallego was widowed and inherited several real properties from her deceased husband and father, respectively, including a tract in San Juan de Teotihuacan, State of Mexico, United States of Mexico (the "Teotihuacan Property") and a tract in the State of Oaxaca, United States of Mexico (the "Oaxaca Property").

8.      Topete owned a Mexican corporation known as Viabilis Holding, S.A. de C.V. ("Viabilis Holding") ("S.A. de C.V." means "Sociedad Anonima de Capital Variable" and is the legal equivalent in Mexico of "Incorporated" or "Inc.").

9.      In or about 2002, Gallego met and began to have business dealings with Topete.

10.      Among their dealings, Gallego and Topete entered into an agreement to acquire the rights to a civil infrastructure project located in both the State of Mexico and the Federal District of Mexico. The infrastructure project, known as the Rio de los Remedios project, involved the development of a highway over a covered sewage canal (the "Project").

11.      In or about 2004, Gallego commenced efforts to obtain initial funding to conduct pre-contract studies in support of the Project.

12.     As a result of her efforts, Gallego obtained approximately US$10 million in loans secured by a mortgage on her Teotihuacan Property (the "Initial Loans"). The Teotihuacan Property was, at the time, valued at US$32 million.

13.     In or about 2007, after pre-contract studies related to the Project were completed, Topete transferred half of his interest in Viabilis Holdings to Gallego so that Topete owned 50% of the shares and Gallego owned the other 50% of the shares.

**b.      Acquisition of Rights to and Performance of the Project**

14.     In or about 2007, both Topete and Gallego recognized that they did not have the resources to perform the Project and, consequently, they entered into an agreement with ICA at that time granting ICA a right to an equity participation in the Project.

15.     As part of that agreement, ICA or one of its affiliates was to pay Viabilis Holdings a US$20 million fee (the "Entrance Fee") to become involved in the Project.

16.     The Entrance Fee was to be paid in four installments:  (a) US$5 million (excluding value-added tax and other fees) in November 2007; (b) US$5 million (excluding value-added tax and other fees) in February 2008; (c) US$5 million (excluding value-added tax and other fees) in April 2010; and (d) US$5 million (excluding value-added tax and other fees) upon final completion of the Project.

17.     In furtherance of that 2007 agreement among Topete, Gallego and ICA, the following corporate structure was formed:

a.      Topete and Gallego formed Consorcio de Desarollo Intercontinental, S.A. de C.V. ("Consorcio"), with shares distributed 15% to Gallego, 30% to Gayosso, 15% to Topete, and 40% to Topete's sister, Gabriela; resulting inTopete and his sister owning 55%, with Gallego and her daughter Gayosso owning 45%.

3

b.      Topete and Gallego formed Corporacion de Desarollo Intercontinental, S.A. de C.V. ("Corporacion"), with shares distributed to the same persons and in the same proportions as the shares of Consorcio.

c.      On information and belief, ICA had previously formed Controladora de Operaciones de Infraestructura, S.A. de C.V. ("CONOISA"), as holding company for the majority of shares of ICA and the majority of shares of ICA-affiliated entities (the "ICA Group").

d.      Viabilis Infraestructura, S.A. de C.V. n/k/a Viabilis Infraestructura, SAPI de C.V. ("Viabilis Infraestructura") was formed, with shares distributed 50% to CONOISA and 50% to Consorcio and Corporacion jointly ("S.A.P.I. de C.V." means "Sociedad Anonima Promotora de Inversion de Capital Variable," a corporation that acts as an investment promoter).

e.      Autovia Urbana TT, S.A.P.I. de C.V. ("ATT") was formed, with shares distributed 50% to Constructores ICA, S.A. de C.V. ("CICASA," an affiliate of ICA) and 50% to Consorcio and Corporacion jointly.

18.    The State of Mexico awarded the Project contract to the parties, through Viabilis Infraestructura, which entity continues to hold that contract to this day.

19.    Viabilis Infraestructura then hired ATT as general contractor for the Project.

20.    Among the many entities sub-contracted for the Project were:  DICSA Norte, Sistemas y Servicios Para Topografia, Sistemas Integral de Ingenieria y Arquitectura, Proyectos Parques Tematicos, Asesoria Ambiental Especializados, Proyectos Estudios y Tecnologia, Sistemas de Redes y Servicios, Tecnologia e Imagen Digital, Proyectos Equipos y Montages, Desarollo Constructor de Ingenieria y Mantenimiento, Ingenieria en Mantenimiento Aplicado,

4

Desarollo Tecnología y Servicios, Ingenieria Constructora y Servicios, Ripsa, ICA Ingenieros Civiles Asociados (on information and belief, a subsidiary of ICA), CICASA, Sinco Sistema Integral de Costos, Simex Integracion de Sistemas, Agencia de Seguridad Privada, Construcciones Industriales del Sur, S.A. de C.V., Olicasa, S.A., Sistema Integral de Costos, S.A. de C.V., Adjust Spain, SL, Infraestructura Intercontinental, S.A. de C.V., Administradora de Servicios e Infraestructura, S.A. de C.V., Promotora de Infraestructura Iberoamericana, S.A. de C.V., Compañía Administradores de Agua, S.A. de C.V., Grupo Constructor Industrial y de Servicios de Hidalgo, S.A. de C.V., and Mexican Technology Corporation, S.A. de C.V. (collectively, the "Subcontractors").

21.     ATT also entered into an agreement with ICA for ICA to effectively become another subcontractor for the Project. On information and belief, ICA took over the performance of the Project and contracted other entities which also functioned as subcontractors.

22.     Viabilis Infraestructura also entered into agreements with Current & Current Corporation Mexico, S.A. de C.V. ("C&C") for C&C to manage ancillary construction projects involving rerouting and securing existing oil and gas pipelines and hidden conditions at the Project site (the "Ancillary Projects"), on Mexican governmental entities.

23.     The Project began soon after the formation of these various corporate structures.

24.     Corporacion and Consorcio were not directly involved in performance of the Project; rather, ICA assumed performance of the Project.

c.     **Gallego Obtains a $40 Million Bridge Loan for the Project**

25.     In or about 2008, Gallego approached Ahorro Corporacion, a consortium of Spanish savings and loans, to extend credit to finance the Project.

26.    Ahorro Corporacion extended a US$40 million bridge loan to Viabilis Infraestructura to finance the Project (the "$40 Million Bridge Loan").

27.    The $40 Million Bridge Loan was secured by an irrevocable guaranty trust based on Gallego's Oaxaca Property (the "Irrevocable Trust").

28.    The Oaxaca Property was valued by Ahorro Corporacion's property appraiser at approximately US$214 Million.

29.    The Oaxaca Property was pledged to Ahorro Corporacion free and clear of all liens (tax or otherwise), encumbrances, or clouds on title.

30.    It was agreed that the Irrevocable Trust was not to be recorded in the public records of Oaxaca.

31.    All of Gayosso's shares of Consorcio and Corporacion were also pledged to Ahorro Corporacion as part of the Irrevocable Trust to guarantee the $40 Million Bridge Loan.

32.    Banco Invex, S.A., Institucion de Banca Multiple, Invex Grupo Financiero ("Invex") was named as the trustee of the Irrevocable Trust.

33.    It would not have been possible to obtain the $40 Million Bridge Loan to finance the Project if Gallego's Oaxaca Property and Gayosso's Consorcio and Corporacion shares had not been pledged as security.

**d.    Viabilis Holdings Acquires a Railway in Chiapas, Mexico, with Project Funds**

34.    In or about 2008, Viabilis Holdings acquired Compañia de Ferrocariles Chiapas-Mayab, S.A. de C.V. (the "Chiapas Railway"), including its capital infrastructure and associated equipment, as well as a related concession for operations.

35.     Topete supervised the acquisition of the Chiapas Railway, using funds from the $40 Million Bridge Loan that were earmarked specifically for the Project, without the knowledge and consent of either Gallego or Gayosso.

36.     Topete only notified Gallego of the acquisition of the Chiapas Railway after that transaction had closed, but never advised Gallego how the Chiapas Railway was acquired or the source of funds used to acquire the Chiapas Railway.

37.     After its acquisition, the equity of the Chiapas Railway was distributed 99% to Viabilis Holdings and 1% to Topete individually.

**e.     ICA Pays Off the $40 Million Bridge Loan and Obtains a Syndicated Loan
from Banobras Without Gallego's or Gayosso's Knowledge or Consent**

38.     In or about 2009, ICA paid off the $40 Million Bridge Loan without Gallego's or Gayosso's knowledge or consent.

39.     ICA tried to subrogate the Irrevocable Trust securing the $40 Million Bridge Loan, but Ahorro Corporacion refused, because that was not part of the terms and conditions of the loan agreement relating to the $40 Million Bridge Loan.

40.     Pursuant to the loan agreement, Ahorro Corporacion was to hold the Irrevocable Trust as security and the Deed of Trust was not to be recorded in the public records of Oaxaca.

41.     Accordingly, Ahorro Corporacion, upon receiving full satisfaction of the $40 Million Bridge Loan, should have released the Irrevocable Trust, which included its security interest in both the Oaxaca Property and the Consorcio and Corporacion shares.

42.     However, neither Gallego nor Gayosso was notified of the payment and satisfaction of the $40 Million Bridge Loan.

43.     Rather, on information and belief, ICA and/or Topete and/or other persons unknown to Plaintiff at this time, modified the Irrevocable Trust so as to permit it to be used as

collateral for a syndicated loan that Banco Nacional de Obras y Servicios Públicos, SNC ("Banobras") had extended for continued financing of the Project (the "Syndicated Loan").

44.     The use of the modified Irrevocable Trust as collateral for the Banobras Syndicated Loan was made without Gallego's or Gayosso's knowledge or consent.

45.     To complete the Syndicated Loan transaction, Topete utilized a power of attorney purportedly executed by Gayosso on August 8, 2007 (the "Gayosso Power of Attorney").

46.     Gayosso did not and could not have signed the Gayosso Power of Attorney because she was not in Mexico on August 8, 2007.

47.     As with the $40 Million Bridge Loan, the Irrevocable Trust was not recorded in the public records of Oaxaca as security for the Syndicated Loan at that time.

48.     As part of the satisfaction of the $40 Million Bridge Loan, Invex released the shares of Corporacion and Consorcio.

49.     In violation of the Irrevocable Trust, however, the Corporacion and Consorcio shares were released to a person not authorized to receive those shares.

50.     On information and belief Topete and/or others are now in possession of all Corporacion and Consorcio shares, including Gallego's and Gayosso's respective shares.  An e-mail reflecting same is attached hereto and incorporated herein by reference as **Exhibit "1"**.

51.     Despite having received all Corporacion and Consorcio shares released by Invex, Topete and/or Paulo Diez, attorney for Viabilis Holdings, Consorcio and Corporacion ("Diez"), and/or others have failed and refused to return to Gallego to Gayosso their respective Corporacion and Consorcio shares.

**f.      Gallego's Requests for Financial Statements Relating to Project were Refused**

52.     In or about 2009, Gallego began asking both Topete and Diez for financial statements relating to the Project, both individually and on behalf of Gayosso.

53.     Throughout 2009 and 2010, both Topete and Diez, utilizing various excuses and pretexts, failed and refused to provide the requested financial statements to Gallego or Gayosso.

**g.      Attorney Paulo Diez Obtains an Interest in Corporacion and Consorcio**

54.     At all times material hereto, Diez, as the attorney for Viabilis Holdings, Consorcio and Corporacion, was charged with representing the interests of, *inter alia*, Topete, Gallego and Gayosso.

55.     Upon Topete's inducement, Gallego and Gayosso agreed to sell a portion of their ownership interests in Corporacion and Consorcio to Diez.  At all material times, Gallego and Gayosso believed that Diez was also acting in their best interests.

56.     Accordingly, in or about 2010, Gayosso and Gallego transferred a portion of their respective interests in Corporacion and Consorcio to Diez.

57.     On information and belief, about this same time Topete and his sister Gabriela also transferred a portion of their respective interests in Corporacion and Consorcio to Diez.

58.     As a result of these transfers of interests, Gallego and Gayosso had approximately a 40% combined ownership interest in Corporacion and Consorcio.

**h.      The Discovery of the Organized Scheme to Defraud**

59.     In or about June 2010, Gallego was in the offices of Viabilis Holdings' in-house accountant and noticed documents evidencing deposits being made to an account in Viabilis Holdings' name at Banco Mercantil del Norte ("Banorte") on the accountant's desk.

60.     Neither Topete nor Diez had previously disclosed to Gallego or Gayosso that Viabilis Holding held accounts at Banorte.

9

61.     Gallego requested Topete and Diez to provide explanations for that account, but they failed and refused to do so.

62.     Gallego then went to Banorte's offices and requested access to information on the Viabilis Holding account, as a shareholder and director of that corporation.

63.     Banorte refused Gallego access to information on the Viabilis Holding account because she was not a signatory on that account.

64.     As a result, Gallego and Gayosso commenced an investigation into any and all fraud connected with the Viabilis Holding account at Banorte.

i.      **The Carousel Scheme to Defraud Tax Authorities and Investors**

65.     As a result of their investigation, Gallego and Gayosso discovered that, since 2007, ICA, Topete, Diez and other persons known and/or unknown to Gallego and Gayosso, had organized and maintained a massive scheme to defraud various Mexican federal, state and local government authorities as well as Gallego and Gayosso.

66.     The scheme was composed of a self-created group of closely-held companies controlled by ICA, Topete, Diez and others, including Viabilis Holdings, Consorcio, Corporacion, Viabilis Infraestructura, ATT, the Chiapas Railway, and various Subcontractors, to intentionally and falsely understate profits to their benefit and to the detriment of taxing authorities of Mexican federal, state and local governments, as well as to their investors, including Gallego and Gayosso (the "Carousel Scheme").

67.     Pursuant to the Carousel Scheme, ICA, Topete, Diez and others orchestrated a carousel of funneling payments, for both services performed and services claimed but never performed, through those closely-held companies.

68.     The Carousel Scheme was orchestrated in or about 2007 between and among ICA, Topete, Diez and other persons.  Various e-mail chains dated May 2-4, 2007 between ICA employee Antonio Sordo Macias ("Sordo"), and Enrique Aguilar, then Director of Viabilis Infraestructura ("Aguilar"), regarding the structure and function of the "carousel" are attached hereto and incorporated herein by reference as composite **Exhibit "2"**. (Aguilar was subsequently replaced by Sordo as Director of Viabilis Infraestructura.)  An e-mail dated May 10, 2007 from Sordo to Juan Manuel Gonzalez Bernal, one of ICA's attorneys with White & Case's Mexico office ("Gonzalez"), referring to the "carousel" of payments is attached hereto and incorporated herein by reference as **Exhibit "3"**.  An e-mail dated May 14, 2007 from Sordo to Aguilar setting forth a schedule of how the "carousel" is to function is attached hereto and incorporated herein by reference as **Exhibit "4"**.  An e-mail from Sordo to Topete dated May 15, 2007 confirming ICA's agreement to the "carousel" of payments, attaching a memorandum of the scheme and a spreadsheet, is attached hereto and incorporated herein by reference as **Exhibit "5"**.  An e-mail from Topete responding to Sordo's e-mail regarding ICA's agreement to the "carousel of payments" is attached hereto and incorporated herein by reference as composite **Exhibit "6"**.

69.     As part of the Carousel Scheme, ICA, Topete, Diez and other persons also conspired to divert and diverted back to CONOISA (the ICA Group holding company) the US$20 million Entrance Fee that CONOISA had agreed to pay Viabilis Holdings.

70.     As part of the Carousel Scheme, a schedule for diverting each of the four US$5 million installments of the Entrance Fee was developed by ICA, Topete and others, including ICA's White & Case-Mexico attorneys.  *See* Exhibit 5, Attachments.

71.     According to the Carousel Scheme:

11

     a.     CONOISA would pay each $5 million tranche of the Entrance Fee to wholly-owned or -controlled Subcontractors using false invoices generated by those Subcontractors. *Id.*

     b.     The Subcontractors would thereafter funnel the proceeds of the Entrance fee to Viabilis Holdings. *Id.*

     c.     Viabilis Holdings would thereafter remit the proceeds of the Entrance Fee back to CONOISA. *Id.*

     d.     Each US$5 million tranche of the Entrance Fee would be diverted in eight (8) discrete installments over the course of one month. *Id.*

72.     In furtherance of the Carousel Scheme, ICA, Topete, Diez and others undertook various activities designed to understating the earnings of Viabilis Holding, Viabilis Infraestructura, and ATT, including:

     a.     preparing false invoices for services claimed but not rendered;

     b.     understating ATT's net profit margin in its financial statements;

     c.     preparing backdated promissory notes;

     d.     diverting syndicated loan funds to pay off the Chiapas Railway Acquisition; and

     e.     acquiring ownership and/or control of C&C to divert project funds.

### *Preparing False Invoices for Services Claimed but not Rendered*

73.     ICA, Topete, Diez and others directly and/or indirectly prepared and submitted for payment false invoices for services claimed but not rendered.  An invoice from the Chiapas Railroad venture to ATT in the amount of Mex.$47 million (approximately US$4.7 million), allegedly for "Administrative Services" (the "Chiapas Railroad Invoice"), as well as supporting

e-mails reflecting ICA's intent to fabricate that invoice, is attached hereto and incorporated herein by reference as composite **Exhibit "7"**.

74.     The Chiapas Railroad Invoice was approved for payment at an ATT board meeting of February 18, 2010, at which neither Gallego nor Gayosso were present.

75.     Lic. Juan Manuel Gonzalez Bernal of White & Case - Mexico was the secretary of the February 18, 2010 ATT board meeting.

76.     On information and belief, the effect of the payment of this fraudulent invoice was to (a) understate ATT's profits to the detriment of its direct and indirect stakeholders, including Gallego and Gayosso, and (b) reduce ATT's tax liability to Mexican tax authorities and ultimately divert funds to ICA and Viabilis Holdings, the Chiapas Railway's parent company.

*Understating ATT's Net Profit Margin in its Financial Statements*

77.     ICA, Topete, Diez and others directly and/or indirectly understated the net profit margin of ATT and reporting that margin to Deloitte, ICA's auditors, for inclusion in Viabilis Infraestructura's 2009 audited financial statements.  A chain e-mail dated February 9-19, 2010 between and among various persons, including Sordo, Diez, Topete, Gonzalez, and Roberto Rios, one of ICA's White & Case – Mexico attorneys, is attached hereto and incorporated herein by reference as **Exhibit "8"**.

78.     On information and belief, the understatement of ATT's net profit margin in its financial statements (a) reduced distributable profits to its direct and indirect stakeholders, including Gallego and Gayosso, and (b) reduced ATT's tax liability to Mexican tax authorities.

*Preparing Backdated Promissory Notes*

13

79.     ICA, Topete, Diez and others directly and/or indirectly prepared backdated promissory notes.  E-mails between Omar Gonzalez Nuncio, Topete and Diez discussing the need to match the interest rate on the backdated promissory notes to the official rate as of the date of backdating are attached hereto and incorporated herein by reference as composite **Exhibit "9"**.

80.     The purpose of the preparation of backdated promissory notes was to reflect the prior fictitious incurrence of expenses obligating Viabilis Infraestructura to repay ICA for ICA's prior unauthorized payment and satisfaction of the $40 Million Bridge Loan.

### *Diverting Syndicated Loan Funds to Pay Off the Chiapas Railway Acquisition*

81.     The funds from the Syndicated Loan - secured by the Irrevocable Trust - capitalized Viabilis Infraestructura and were earmarked for the Project.

82.     ICA, Topete, Diez and others directly and/or indirectly diverted Mex. $200 Million (approximately US$20 million) from the Syndicated Loan to pay down a loan by ICA to Viabilis Holdings for the acquisition of the Chiapas Railway, as previously agreed to in Miami. An e-mail chain dated August 14–18, 2009 between Topete and Alonso Quintana Kawage, then CFO of ICA is attached hereto and incorporated herein by reference as **Exhibit "10"**.

### *Acquisition of Ownership and/or Control of C&C to Divert Project Funds*

83.     Topete, Diez and others schemed to acquire ownership or control of C&C and misrepresent C&C's capabilities and experience in order to obtain contractor authorizations from Petroleos de Mexico ("Pemex") for Ancillary Projects involving underground oil and gas pipelines owned by Pemex (the "Contractor Authorizations").

84.     On information and belief, Topete, Diez and others thereafter forged the signature of C&C's legal representative on separate project management agreements with Viabilis

Infraestructura and ATT (the "Project Management Agreements") and used those agreements for purported Ancillary Projects on the Pemex pipelines supposedly being worked on by ICA. A chain e-mail dated December 13-14, 2009 between and among Topete, Diez, and Gabriel de la Concha (then CFO of ICA) is attached hereto and incorporated herein by reference as **Exhibit "11"**.

85.     ICA, Topete, Diez and others then furthered the scheme by causing C&C to issue false invoices to ATT and/or Viabilis Infraestructura for work on Ancillary Projects claimed but not performed.

86.     On information and belief, once C&C was paid by ATT and/or Viabilis Infraestructura for services claimed but not performed, ICA and Topete would cause C&C to "lend" those proceeds to Viabilis Holdings and/or ICA, without Gallego's or Gayosso's knowledge or consent.

87.     On information and belief, it was never ICA's or Topete's intention to have those "loans" repaid.

**j.     Effects of the Carousel Scheme**

88.     ICA, Topete and others furthered the Carousel Scheme without Gallego's or Gayosso's knowledge or consent by, *inter alia*, holding Viabilis Infraestructura board meetings while Gallego was absent and/or away from Mexico, and thereafter falsifying her signature on the minutes of those board meetings.  An e-mail enclosing the signature page of the minutes of the May 15, 2000 Viabilis Infraestructura board meeting reflecting Gallego's falsified signature is attached hereto and incorporated herein by reference as **Exhibit "12"**.

89.     These and similar intentional acts – discovered and undiscovered – in furtherance of the Carousel Scheme falsely increased reported Project expenses, reducing ATT's, Viabilis Infraestructura's and Viabilis Holding's reported tax liabilities to Mexican authorities.

90.     These acts also reduced the reported earnings and dividends of ATT, Viabilis Infraestructura and Viabilis Holding otherwise due to Gallego and Gayosso as shareholders of Consorcio and Corporacion.

**k.     Gallego and Gayosso Discover the Syndicated Loan
        <u>was Collateralized with the Irrevocable Trust</u>**

91.     In or about September 2010, while conducting her investigation, Gallego first discovered that the Irrevocable Trust had been modified so as to collateralize the Syndicated Loan with Banobras (the "Trust Modification").

92.     On information and belief, Topete represented to Banobras that the Gayosso Power of Attorney authorized him to execute the Trust Modification.

93.     Gallego notified Banobras, ICA, and Invex in writing that that neither she nor Gayosso consented to the pledge of the Irrevocable Trust or the Trust Modification as collateral on the Syndicated Loan (the "Gallego Notices").  The Gallego Notices, recorded through a notary in the public records of the Federal District of Mexico, are attached hereto and incorporated herein by reference as **<u>Composite Exhibit "13"</u>**.

94.     Despite receipt of the Gallego Notices by Banobras, ICA, and Invex, the Trust Modification was recorded in the public records of Oaxaca.

95.     The recordation in Oaxaca of the Trust Modification was accomplished by use of a purported power of attorney which Gallego did not actually sign.

96.     Despite having received the Gallego Notices, ICA has failed and refused to take any action to release Gayosso's Viabilis Infraestructura shares to her.

16

I.     **RICO Predicate Acts of the Carousel Scheme**

*ICA is Engaged in a Pattern of Racketeering Activity*

97.     Defendants and others known and unknown to Gallego and Gayosso are engaged in an ongoing pattern of racketeering activity as defined and as prohibited by 18 U.S.C. § 1961, *et. seq*., and the Florida Racketeering Act, Fla. Stat. § 895.01.

98.     On information and belief, Defendants and others engaged in a pattern of racketeering activity consisting of more than two acts of racketeering activity, the most recent of which occurred within 10 years after the commission of a prior act of racketeering.

99.     Defendants and others, known and unknown to Gallego and Gayosso, have violated and continue to violate 18 U.S.C. § 1343, which states: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings … for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both … ."

100.     Defendants are engaged in an ongoing pattern of racketeering as defined and prohibited by Florida Statutes § 895.02(34) as it relates to "fraudulent practices, false pretenses, and fraud generally."

101.     For purposes of Florida RICO, Defendants and others, known and unknown to Gallego and Gayosso, have engaged in a pattern of racketeering activity by engaging in at least two incidents of racketeering conduct that have "the same or similar intents, results, accomplices, victims or methods of commission … and are not isolated incidents, in that at least one such

incident occurred after the effective date of the Act, and that the last such incident occurred within 5 years after a prior incident of racketeering conduct."

102.   Each violation constitutes "racketeering activity" under RICO and Florida RICO (Fla. Stat. § 895.02).

### The Carousel Scheme Involves a Distinct Threat of Long-Term Racketeering

103.   Based on the *modus operandi* of ICA, Topete, Diez and others known and unknown to Gallego and Gayosso, their racketeering activity involves a distinct threat of future long-term racketeering activity.

104.   Specifically, the frequent use of legal entities by ICA, Topete, Diez and others known and unknown to Gallego and Gayosso to advance the Carousel Scheme, the ease by which they manipulate and report financial information for fraudulent purposes through the Carousel Scheme, the transfer funds via wire both from and to bank accounts in the United States, including this District, and the material enrichment they derive from this unlawful activity with impunity to date, can only entice them to continue this unlawful pattern.

### The Carousel Scheme is a RICO Enterprise

105.   The ongoing pattern of violations since the inception of the Carousel Scheme in or about May 2007 constitutes an "enterprise" as defined by RICO.  Each RICO family member participates in the wrongful acts unlawfully reducing the reported earnings and dividends of ATT, Viabilis Infraestructura, Consorcio, Corporacion and Viabilis Holding.

106.   On information and belief, a substantial portion of the moneys unlawfully obtained by ICA, Topete, Diez and others, known and unknown to Gallego and Gayosso, were transferred from bank accounts in Florida owned and/or controlled by Gallego to bank accounts

in both Mexico and the United States, including this District, owned and/or controlled by ICA, Topete, Diez and/or others known and unknown to Gallego and Gayosso.

107.   ICA, Topete, Diez and others, known and unknown to Gallego and Gayosso, share the common purpose of profiting from the aforementioned activities by diverting funds earmarked for the Project for their exclusive benefit.

108.   The association and interplay among and between the aforementioned members of the Carousel Scheme, including ICA, Topete, Diez, ATT, Viabilis Infraestructura, Viabilis Holding, C&C, various Subcontractors, and others, known and unknown to Gallego and Gayosso, is precisely the type of enterprise which RICO was intended to punish and deter.

### The Carousel Scheme Affects Interstate Commerce

109.   The enterprise affects interstate commerce because the funds obtained for the purpose of initially funding the Carousel Scheme were transferred via wire from bank accounts in Florida, owned and/or controlled by Gallego, across the Mexico-U.S. border to bank accounts in Mexico owned and/or controlled by ICA, Topete, Diez, and/or others.

110.   Funds derived from the Carousel Scheme are also transferred via wire across the Mexico-U.S. border and deposited to bank accounts throughout the United States, including this District, owned and/or controlled by ICA, Topete, Diez, and/or others known or unknown to Gallego and Gayosso.

111.   The wire transfers also affect interstate commerce through the use of telecommunications technology, inherently radio transmissions traversing state lines, thus implicating interstate commerce.

112.    ICA, Topete, Diez and others, known and unknown to Gallego and Gayosso, accepted and retained the benefits of the racketeering activity, thereby ratifying the conduct of all those assisting in committing the racketeering activity.

### The Carousel Scheme has a Distinct Nexus with Miami

113.    The Carousel Scheme had a distinct nexus with Miami because of multiple telephone communications between Miami and Mexico pertaining to the conduct complained of herein, between Plaintiffs and Defendants and/or their agents, and because of multiple wire transfers by Gallego from Miami to Mexico, upon Topete's periodic requests.

114.    Specifically, between 2004, when Gallego and Topete began their business relationship and June 2010, Topete, Carlos Mendez of ICA and/or others ICA representatives communicated with Gallego by telephone regarding the Project, while she was in Miami.

115.    The phone conferences between Gallego, while in Miami, and Topete and/or ICA representatives, in Mexico, took place on a nearly daily basis.

116.    Between 2004 and 2008, during phone conferences with Gallego in Miami, Topete periodically requested funds from Gallego, allegedly in order to finance the Project.

117.    Upon Topete's requests purportedly for continued Project funding, Gallego periodically wired funds from Miami bank accounts she owned and/or controlled to bank accounts in Mexico directly or indirectly owned and/or controlled by Topete and/or ICA.

118.    Between 2005 and 2008, Gallego transferred over US$10 million via wire from Miami to bank accounts in Mexico directly or indirectly owned and/or controlled by Topete and/or ICA.

119.    The funds from these wire transfers represented proceeds from the Initial Loans secured by the Teotihuacan Property, and were transferred to Mexico in three tranches:

a.      Approximately US$6 million between about May and December 2005;

b.      Approximately US$3.8 million between about February and October 2006; and

c.      Approximately US$1 million in or about 2007.

120.    Once Defendants had obtained the Syndicated Loan from Banobras (*i.e.*, after 2008), Topete, in phone conferences with Gallego in Miami, continually complained that the Project lacked adequate funding.

121.    Defendants consistently attempted to keep Gallego in Miami and communicate with her by telephone in order to ensure that she did not have access to the books and records of Viabilis Holdings, Viabilis Infraestructura, Consorcio, Corporacion, ATT or the Project, in order to discover the Carousel Scheme.

*Gallego and Gayosso Have Been Damaged by the Carousel Scheme*

122.    Defendants injured Gallego and Gayosso through their unlawful Carousel Scheme, intentionally undervaluing the shares of Corporacion and Consorcio.

123.    Defendants injured Gallego and Gayosso by failing and refusing to deliver to them their Corporacion and Consorcio shares upon Invex' release of those shares.

124.    By their unlawful conduct, Defendants have retained significant funds to which they are not entitled, to the material detriment of Gallego and Gayosso.

m.      **Miscellaneous**

125.    Plaintiffs have retained undersigned counsel to represent their interests herein and have agreed to pay undersigned counsel a reasonable fee for their professional services.

126.    All conditions precedent to the commencement of this action have been met, satisfied, or waived.

## CLAIMS FOR RELIEF

### Count I
### Violation of Federal RICO - 18 U.S.C. § 1962 (c)

127.    Gallego and Gayosso reallege and incorporate paragraphs 1 through 126 above as though set forth herein *verbatim*.

128.    The foregoing conduct constitutes violations of RICO as outlined in 18 U.S.C. § 1343 as well as 18 U.S.C. §1962(c).

129.    Gallego and Gayosso suffered and continue to suffer damages as a result of Defendants' violations of 18 U.S.C. §1962(c).

WHEREFORE, Gallego and Gayosso demand judgment against Defendants for damages pursuant to 18 U.S.C. § 1964(c), including consequential damages, treble damages, attorneys' fees, interest, costs, and all such other and further relief as the interests of justice may require or permit.

### Count II
### Violations of Florida RICO - Florida Statutes §§ 895.01, et seq.

130.    Gallego and Gayosso reallege and incorporate paragraphs 1 through 126 above as though set forth herein *verbatim*.

131.    Defendants' racketeering activities are: use of fraudulent practices, false pretenses and general fraud via the Carousel Scheme to divert funds earmarked for performance of the Project for the benefit of Defendants and others known and unknown to Gallego and Gayosso.

132.     The racketeering also includes: transfer of diverted funds to bank accounts from the United States, including this District, to Mexico under false pretenses and, thereafter, from Mexico back to the United States, including this District, which accounts are owned and/or controlled by Defendants and/or others known and unknown to Gallego and Gayosso.

133.    As a result of those unlawful actions, Gallego and Gayosso have sustained and continue to sustain injury and damages.

WHEREFORE, Gallego and Gayosso, pursuant to Fla. Stat. § 895.05, request that Defendants be enjoined from further racketeering and that the Court issue one or more orders prohibiting such practices and/or imposing restrictions prohibiting future violations by Defendants, such as, but not limited to, dissolution of Defendants and suspension and revocation of licenses, and any of the remedies available under the Act.

### Count III
### Breach of Fiduciary Duty

134.    Gallego and Gayosso reallege and incorporate paragraphs 1 through 126 above as though set forth herein *verbatim*.

135.    Defendants, directly and indirectly, as joint venturers with Gallego and Gayosso and as stakeholders in and operators of Viabilis Infraestructura, owed and owe a fiduciary duty to Gallego and Gayosso as stakeholders in Viabilis Infraestructura.

136.    Defendants breached their fiduciary duties to Gallego and Gayosso by forming and participating in the Carousel Scheme and by other unlawful acts set forth herein.

137.    Defendants' acts and omissions set forth herein were intentional and resulted in damages and/or irreparable harm to Gallego and Gayosso.

WHEREFORE, Gallego and Gayosso demand judgment against Defendants for damages, including consequential damages, interest, costs, and all such other and further relief as the interests of justice may require or permit.

*Count IV*
*Misappropriation of Viabilis Infraestructura's Corporate Property*

138.    Gallego and Gayosso reallege and incorporate paragraphs 1 through 126 above as though set forth herein *verbatim*.

139.    At all times material hereto, Defendants, directly and indirectly, as joint venturers with Gallego and Gayosso and as stakeholders in and operators of Viabilis Infraestructura, owed Gallego and Gayosso a duty of honesty, loyalty, fiduciary obligation, and good faith and fair dealing, and were prohibited from self dealing, whether or not disclosed, including utilizing Viabilis Infraestructura's corporate property composed of, *inter alia*, funds it received for performance of the Project for other than their intended use.

140.    By forming and participating in the Carousel Scheme and other unlawful acts set forth herein, Defendants breached all of the aforesaid duties to Gallego and Gayosso, including by, *inter alia*, misappropriating Viabilis Infraestructura's corporate property for purposes contrary to the interests of Viabilis Infraestructura, Gallego, or Gayosso.

141.    As a consequence of Defendants' violations of their duties, Defendants have caused damage and harm to Gallego and Gayosso.

WHEREFORE, Gallego and Gayosso demand judgment against Defendants for damages, including consequential damages, interest, costs, and all such other and further relief as the interests of justice may require or permit.

*Count V*
*Unjust Enrichment*

142.    Gallego and Gayosso reallege and incorporate paragraphs 1 through 126 above as though set forth herein *verbatim*.

143.    Defendants received benefits from Plaintiffs Gallego and Gayosso.

24

144.    Defendants voluntarily accepted, retained and took the benefits conferred by Plaintiffs and are enjoying said benefits at Plaintiffs' expense.

145.    The circumstances are such that it would be inequitable for Defendants to retain the benefits without paying the value thereof to Plaintiffs.

WHEREFORE, Gallego and Gayosso demand judgment awarding them the value of the benefits conferred, including but not limited to disgorgement of profits, interest, costs, and all such other and further relief as the interests of justice may require or permit.

### Count VI
### *Imposition of Constructive Trust on ICA*

146.    Gallego and Gayosso reallege and incorporate paragraphs 1 through 126 above as though set forth herein *verbatim*.

147.    Defendants engaged in wrongful conduct, including breach of fiduciary duty, violations of federal and Florida RICO statutes, and unjust enrichment.

148.    As a result of Defendants' inequitable conduct, Defendants have gained and stand to gain further, having engaged in the wrongful conduct set forth herein, and having diverted proceeds from that conduct in the United States and this District.

149.    In equity and good conscience, the results of Defendants' inequitable conduct should not be permitted to stand.

150.    To remedy the inequitable result of Defendants' wrongful conduct, a constructive trust should be imposed over Defendants' property in the United States and in this District during the pendency of this action.

WHEREFORE, Gallego and Gayosso request that this Court impose a constructive trust on Defendants' properties in the United States and in this District, and for such other relief as the interests of justice may require or permit.

## DEMAND FOR JURY TRIAL

Plaintiffs Gallego and Gayosso demand trial by jury of all issues so triable as of right.

Dated October 28ᵗʰ, 2011.

By: _____

Roger S. Kobert (FBN: 765295)
*rkobert@raffertylawyers.com*
Marc C. Pugliese (FBN: 86169)
*mpugliese@raffertylawyers.com*
RAFFERTY, KOBERT, TENENHOLTZ,
    BOUNDS & HESS, P.A.
1401 Brickell Avenue, Suite 825
Miami, Florida 33131-3502
(305) 373-0330    Telephone
(305) 373-2735    Facsimile
*Counsel for Plaintiff*

## VERIFICATION

I, GUADALUPE GALLEGO OCHOA, plaintiff in this case, hereby state, subject to the penalties for perjury, that the allegations in the foregoing Verified Complaint are true and correct, to the best of my knowledge and belief.

_____
GUADALUPE GALLEGO OCHOA


STATE OF FLORIDA          )
                          ) ss:
COUNTY OF MIAMI-DADE      )

The foregoing was acknowledged before me this 27 th day of October, 2011, by GUADALUPE GALLEGO OCHOA, who did provide as identification, _Mexican Pass. 0738006/814_____ and who did take an oath.


_____
NOTARY PUBLIC, State of Florida

MELBA MOLINA
MY COMMISSION # DD 889742
EXPIRES: June 9, 2013
Bonded Thru Budget Notary Services


My commission expires: _Jun 9, 2013._

27

## VERIFICATION

I, GUADALUPE ARANZAZU GAYOSSO GALLEGO, plaintiff in this case, hereby state, subject to the penalties for perjury, that the allegations in the foregoing Verified Complaint are true and correct, to the best of my knowledge and belief.

_____

GUADALUPE ARANZAZU GAYOSSO GALLEGO

STATE OF FLORIDA          )
                          ) ss:
COUNTY OF MIAMI-DADE      )

The foregoing was acknowledged before me this 27th day of October, 2011, by GUADALUPE ARANZAZU GAYOSSO GALLEGO, who did provide as identification, DL- G 224-281-86-603-0   Exp. 4-21-12   and who did take an oath.

MELBA MOLINA
MY COMMISSION # DD 889742
EXPIRES: June 9, 2013
Bonded Thru Budget Notary Services

_____

NOTARY PUBLIC, State of Florida

My commission expires: Jun 9, 2013

28